In March 2004, planes hijacked and defected an airhope raceway in Vietnam's Hanoi region.   The United States Court of Appeals for the Federal Circuit is now open and in session. God save the United States and this honorable court. Thank you. Be seated. Okay, the first argued case this morning is number 16, 14, 13, Lunar Eye Incorporated against Mattel. Mr. Abbott. Good morning, Your Honor. Good morning. Good morning, Your Honor. The police and the court. Your Honor, there's an extraordinary amount of diligence has gone into confirming the patentability of the 035 patent. Two years of prosecution in its original prosecution. Two years of next party reexamination in which the three original claims were confirmed and 21 new claims were added. In addition to that, there has been almost 10 years worth of litigation in the Eastern District of Texas on this patent. In connection with that litigation, there's been two claim construction hearings. There's been one claim construction ruling and my client, Lunar Eye, has overcome one summary judgment on indefiniteness. So there's been an extraordinary amount of time by the PTO and the district court with respect to this patent. Until we get to the PTAB, when we get in front of the board, Your Honors, we are facing something where we've come full circle. And what we have now in the briefings today and the written decisions by the board is exactly what Lunar Eye has been arguing all along. That the seminal references in this case, Encore and Lewis, do not in fact explicitly disclose what we've characterized as the data selecting and the data reordering elements. And so there was no evidence presented by the petitioner on that. The petitioner in their petition raised that very issue. Both Mohan and Lewis explicitly disclosed those limitations. And what the board ultimately concluded in both IPRs was something that was never briefed, argued, discovered, or tried before the PTAB. And that was both Lewis and Encore would reasonably suggest, would teach or reasonably suggest to a person of ordinary skill in the art, that they could be modified to achieve the claim data selecting and data reordering elements. Now, does all of this, though, turn on your prevailing on the claim construction argument? In part, Your Honor, and I have three or four main arguments. One of which, the first of which, is claim construction. We believe that the board misconstrued at least the data selecting element, the data selecting device, the term reorders. And they also ignored two separate terms interrelated to that. One being produce, produces, or producing, depending upon the independent claim language we're looking at. And what a location signal is. And so while those two terms, those, the produce and location signal, weren't directly before the board, they were certainly relevant to these constructions of data selecting device and reorders. So in addition to claim construction, Your Honor, and a very, very significant, important error that they committed, was that they misunderstood or misinterpreted the basic GPS technologies and science behind this, which is recited in Encore itself. So they ignored that. The third point, Your Honor, is they misread Encore and they misread Lewis. And fourthly, to wrap everything up, they rendered these conclusory opinions with respect to these ultimate conclusions on Encore and Lewis, and that they would teach or reasonably suggest to one ordinary school in the art that they could be modified. And these conclusions that I'll point out to you today, I'm sure you may have some questions on it, again, they weren't in the four corners of the petitions. They weren't discovered. They weren't tried before the PTAT. And these are all, after the fact, hindsight arguments that were essentially created out of whole cloth and completely contradict, in some instances, both parties' experts. Well, do you have to win on every single one of those arguments? No, Your Honor. I don't believe that's the case. I don't believe that's the case. I think that any one of those arguments will put us where we want to be and that this matter should be reversed and rendered. Not remanded, but rendered in this instance. Because if you were to remand, there's no evidence, there's no grounds for what the board ultimately held with respect to this combination or this teaching or reasonable suggestion. So it's not even part of the grounds and there's no evidence on it before the board. So we need, with respect to let's go to data selector, do we have to find disclaimer in order for you to prevail on that? Yes, Your Honor. I believe that's the case. But how do I do that when you're actually asking us to find an implicit disclaimer and there are all kinds of places in the specification where you refer to examples and preferably, and you even refer to alternative embodiments. How do I find a disclaimer? Well, Your Honor, I think the language of the specification itself and what, when read in view of the claims, I mean if you look as a representative claim, Claim 3, Paragraph 1, talks about the location signal generator device. In other words, a GPS receiver, which Encore is. Your Honor, the GPS receiver in Encore, that is Limitation 1, Paragraph 1. We don't dispute that. What we do dispute is what is not in the Encore and the data selecting device there. Because as the appendix points out at 931, we have a separate system controller that's outside of Encore. Do I understand your disclaimer argument to be relying on, it's a specification disclaimer argument, relying on Columns 7, Lines 4-20? Yes. How does that language in Columns 7, Lines 4-20 constitute a disclaimer? Well, it tells you what the GPS receiver does. It outputs the signal. And we make no bones about it. The invention says that you can use a commercially available, off-the-shelf GPS receiver like the Motorola Encore, which, interestingly enough, is the same family of GPS receivers that did the Encore reference. And so we can use that. We can use any other commercially available GPS receiver. But how does that say, don't use that as the selection means? I mean, that's what I think your disclaimer argument is. Right. And I don't see that in the plain text of Columns 7. And that may just be a difference of opinion on our part. We see that the signal is output. And it's produced by virtue of Claim 3, Paragraph 1. The location signal generator device produces the signal. So it's output. The language in the column you're referring to, the excerpt you're referring to, says it outputs the signal. And then right after the discussion of GPS receivers, it talks about selecting less than all and reordering. I guess maybe the question is because it says, for example, it could work this way. Or here's an example. And it doesn't have this part of the specification does not include the kind of language that we would ordinarily see in a disclaimer case where it says, in this invention, the selection cannot be by the Motorola Encore product, for example. Right. It is not a Brightline express disclaimer. But I think that if you look at it in view of the other figures, say, for example, figures 2, figures 5, and figures 9, where we show the output of the GPS receiver going to a separate controller and then modifying that sentence and then a separate signal comes out after it's been parsed and reordered, that further buttresses the argument that what we're talking about here is simply commercially available GPS receivers that may be used for the GPS receiver limitations. Not so much the data selecting limitations. And there's good reason for that. As one of ordinary skill in the art would understand, as well as what the inventor understood, is that the GPS receiver, the Encore receiver, or any other GPS receiver at the time, does not recycle NMEA messages such that it takes the data that it produces to the outside world, or is intended to produce to the outside world, for further processing, as we claim. It does not take that data and recycle it or reprocess it to come up with a separate data. So are you saying that the embodiments shown in the specification, even if it's not listed as the present invention or you don't have any of that language, that just because those are the embodiments shown that that constitutes a disclaimer? Well, Your Honor, I think when you look at the specification in view of the claims themselves, that that's where we get the disclaimer. And I will agree, it's not an express disclaimer. It does not say, this is not a data selecting device. And part of your problem is that the standard that we're looking at here, it might be true that if we were under Phillips, that you could say, well, the most reasonable reading of this is to say that these embodiments are really what they're talking about. But when you're talking about the broadest reasonable interpretation, you've got a different animal. Understood, Your Honor. But I think that the broadest reasonable interpretation must still be reasonable in view of both the intrinsic evidence as well as the extrinsic evidence. And the evidence that we do have on this is from Gordon Howell, the petitioner's own expert, our expert, and the board. And that is that the Encore reference, the GPS receiver reference we're talking about, did not, in fact, further process a NMEA sentence once it was originally ordered. It did not recycle those sentences. So that's a different argument, as I understand it. Now you're talking about a substantial evidence question and whether the prior art meets the limitations, not a claim construction issue. Well, I think, to some extent, I certainly agree with that. But I do think that the way that the court has construed reorders, or I'm sorry, the board has construed reorders, brings us right back into claim construction. They gave short shrift to our proposal that there must be an original order of data before it's reordered, as the claims require. And so just at a passing glance, we don't even need to address that. And that's what we've asked this court for, is to say we need an original order here so that it can be read against this prior art, whether it be Encore or Lewis, to establish that there was no original order that was subsequently parsed by the data selector and then reordered. So I think it dovetails both issues, both the claim construction issue as well as the two characteristic substantial evidence issue. And so in addition to that, I think that it's imperative for the court to understand and to look at this Encore reference and what it does teach. And at 931, it talks about, of the Encore manual, it talks about that this is in fact a device that is part of an overall system. It is merely a GPS receiver. It receives signals, it reports those signals. It talks about the RS-232 that transmit the processed pneumonia strain that's processed in its first instance to the outside world to a separate system controller, which is what Encore calls it. And that system controller falls right into where our second paragraph of Claim 3 is. That is our data selector. What is not described in Encore is what processing occurs. So are you saying that this reordering means that in order for Encore to teach any of this, that Encore has to order the data in exactly the same way? No, it doesn't have to order it in exactly the same way. It could be any one of the pneumonia strains that we've talked about. It's just that it doesn't reprocess those signals again, as the board implies or suggests or expressly states in its order. It just doesn't do that. And there's really good reasons not to in the record, and that is time. We're talking about moving this data as fast as possible to get a triangulated location of the vehicle or the processor itself. And so the longer we take by going back and reprocessing a signal, it essentially renders the product inoperable because it's inaccurate. Your data is old and stale by the time it reprocesses that. So you're really not disputing the claim construction on reorder because, I mean, they adopted yours. You're just saying that when they applied that to Encore? Well, Your Honor, they did in part with respect to their definition, but they neglected the second component of that, and that is it applies original order before the reordering element, which I think is from the plain language of the word reorder. There has to be an order before it's reordered. Let's hear from the director, and we'll save you a little time. Thank you very much. Ms. Zunt. Can you start where he left off? Because it took him a long time to get there, but the reordering part is one of the things that I had some difficulty with here. How do you reorder something if there isn't an original order from which to reorder? Well, I think, Your Honor, the board, there was a fight below just putting some context to it. In the initial petition, George Gordon argued that Encore and Lewis must reorder, must select and reorder, because you do have the two output data streams with two different amounts and orders of location data. So you have one with more, the GA, and you have one with less, the LL. And so because it has that output, it must have been doing it. They also, by the way, argued that that was within the skill and the art, and I'd like to point just for the record to Appendix 217, where the petitioner said in the initial first petition, it is clear that the data-selecting and data-reordering elements are nothing more than standard formatting capabilities that were well-known at the time of the purported invention. I'll let you get to that. Now, admittedly, that was not. They spent much more time on it must be reordering, but they did have that in their first petition. Let me get to that. So did you say GA 217? Yeah, 217. Okay, thank you. It's at the top. Okay, but this is just a statement in a petition. So how is that? And this was more to address that this is part of the argument the whole time was that more than the express teachings of Encore and Lewis were at issue. The issue was how to read the fact that these output sentences have these different amounts of data. They must be getting them some way. What testimony was there to support this proposition that this would be, you know, something within the ordinary skill of the art for someone to understand that something that's not expressly taught is somehow taught? It depends on the second IPR. There was the admission of Lunarizone expert, McAlexander, that said that data reordering and data selection are within the skill and the art. There are innumerable ways to do it. It's really you could cut and paste it. You could do it from scratch, as Lunarize suggests, that each message is independently generated without any initial ordering. And I'll point you to I think the reply in the second IPR has the best summary of the evidence and the discussion on this. GH argued that, and I don't think it's disputed, that when the location data is calculated by the GPS, it calculates latitude, longitude, et cetera, then it outputs it in MMEA messages, the two different MMEA messages. It's stored beforehand. Now the question is what kind of order is it stored in? Lunarize argued that it needs to be stored in a specific order for that to count as ordering. And GH argued it's got to be in an order. It's stored in an order. Everything has an order. If it's stored, it's ordered. The messy papers on one's desk may not look like they're in an order, but they're in an order. Not on my desk. So that was the dispute on what does that initial ordering have to be. So you're saying that the initial ordering could just be something haphazard? Well, I think, again, it's a question. I think that it could be. I mean, right now these papers are in an order. It's one, two, three, four, five. It's in an order. It may not be alphabetical or chronological, but there is an order to them. Is your point that there's first the argument that this limitation is necessarily met by the prior art, and then alternatively it would have been obvious to one of ordinary skill in the art anywhere as well within the one of ordinary skill in the order? I think you only need to get to the first part, because I think the line between what a reference teaches and suggests versus obviousness is a fine line. So maybe you have to get across that to obviousness, but I think here you don't. I think here, like some of the old CCPA cases when they're discussing, you know, whether a range is taught where mixing two fibers is disclosed. There's no expressed disclosure of mixing of what the range needs to be, but there's a disclosure of mixing the fibers. That wasn't treated as necessarily you need to get to more than the obvious, that it's obvious. I mean, it's an implicit teaching within the reference. I feel like here the table, like my example analogy would be if you have a prior art reference directed to a pool table, a novel kind of pool table, and they say that the legs are affixed to the pool table, but they don't say exactly how. So was the board's concern that on the broadest reasonable construction as opposed to, let's say, the correct construction as was presented in the district court, in that space that was the space that justifies the board's decision? Well, Your Honor, the petitioner below, and the board could have gone this far too, argued that even under the district court's decision, the reference would have both references. How does the board treat the district court's decision when it's a prior decision on the record that then is presented as background? Is it ignored? Apparently it's ignored completely. Is that correct? No, Your Honor, they did address it. They discussed the decision, and in the final decision, it's not an institution decision, there was a bit more briefing on it, but in the briefing for the final decision, it was just not much at all bilinearized. So given that it was not much bilinearized, the board addressed the argument, and this was a decision, Your Honor, on indefiniteness, which addressed, did not have the same arguments, the same briefing before it. Do I hear you saying that the board completely ignores what's happened in your courts if they think that some other conclusion suits them better? I don't think that's what happened here, Your Honor. Well, they came out differently. They did come out differently, but they... So they had to have ignored it. It's there. It's supported. It hasn't been reversed. They addressed it and found that it was not applicable and found that there's other portions of the specification and the claims that were did not address because it was addressing a different question. It was indefiniteness, and there's a... And even if it weren't addressing the same question, we're not in that space right now, but if they were addressing the same question, there are different arguments and different parties here. That district court case wasn't even the same petitioner. It was a different petitioner. Was it the same patent? Was it the same patent? The same prior art? It was... No, no, because it was indefiniteness, so they didn't reach the prior art, Your Honor. Well, it was the prior art that was chosen by the court. It was fully litigated, whether it was identical or not, or are you saying that unless or if the prior art is identical in the court and in the board, then the board would be bound by what the court has decided? I'm not going that far, Your Honor, but that wasn't the case here because it wasn't in depth. They weren't considering the prior art at all at that point. So you're saying that the board's position, as well as I can tell, and it's pretty clearly stated in your brief, is that never mind, we ignore it. And I just want to be sure that that's the board's position. You're here representing the director and the board, are you not? Yes, Your Honor. So this is a significant aspect of the statute and of policy. I want to be sure I understand the office's policy when there is a prior judicial decision. The board's policy would be to look at the case presented and look at the arguments presented. If there is a district court decision that is brought to its attention, it should consider it, including all the evidence that's brought before it, and should give it the weight, the persuasive weight, because it's not binding on the board, give it the persuasive weight that it's due, like a sister court would give another sister court. Your answers here are far more reasonable than your statements in the brief, and that's one of the things that's concerning, I think. You actually say in the brief that IPRs are not even adversary proceedings and that in IPRs, it's a public interest proceeding in which your obligation is to get rid of bad patents. And now you cite Quozo for that, which does not say that. But, I mean, that is, it's one thing to say we have different standards, different burdens, but quite another to say that an IPR is not an adversary proceeding. I mean, that's exactly what Congress created. If I said that, Your Honor, I think that must have flown by inappropriately. I mean, certainly they are adversary proceedings. So if that is, I'll go back and look, but that is something that was not intended. They certainly are adversary proceedings. But the language, they're not intended to get rid of bad patents. Quozo doesn't say that, but Quozo does say that they do have that, that is a salutatory effect of those proceedings. And also to strengthen good patents. And to strengthen good patents. But it's not a public interest in getting rid of patents. Over time, the Supreme Court has had cases where they have said that, and the Supreme Court jurisprudence has shifted, right? So you have the 40s. I think there were some cases in the 40s that were pretty strong with some lost language. But this is the 40s. The AIA didn't exist in the 40s. This is an adversary proceeding that was specifically drafted by Congress to actually perform the function in certain narrow areas of an alternative adversary proceeding where the board is not an advocate. The board is acting like, as you say, a sister court, right? Right. And again, if part of the statements of the brief went beyond, if the language of that paragraph sounds like it went beyond that, I think that what I'm saying today is what we're trying to say, which is you don't ignore it. I mean, district court that looked at evidence is important. And every case that I've seen in my limited universe, where the district court opinion has been brought to the attention of the board, they have at least considered it. And they may not have reached the same ultimate result, but they did not ignore it. They did not view it as something that was something they didn't even look at. Do you foresee any obligation on the office when they decide that they're going to reach a conclusion contrary to what's been reached in the court to explain why? I think that they should, and I think that if it is briefed, I think that if the issue is briefed. As what, as an appellate tribunal from the district court? Is that the role that you see for the PTAP? Not as an appellate tribunal, but as a sister court that would differ, find a different claim construction or a different conclusion on a different set of facts from another court. I think that that is entitled district court judges analysis is entitled to respect. It might be a different issue. And in that case, it's the analysis may be less applicable. Well, let's just say it's the same issue. It's certainly the ultimate question is the same validity or not claim construction. One is brought slightly broader than the other. And I didn't want to pin you down on this point, but I think I heard you say that the difference turned on the different standards. Is that a fair statement? I don't think it does. This was something that I think maybe one of the previous. I think that under it is a different standard. I don't I think that that is what isn't very different. They're both supposed to reach the correct result on a matter of law. Claim construction is a matter of law. So it's only how the underlying facts, if it turns on the underlying facts, are viewed. Isn't that right? Well, isn't it for indefiniteness? And correct me if I'm wrong. Isn't that still considered beyond the clear and convincing standard of proof? And that the claims were intended to preserve validity. I know that the district court said that in its opinion. And those are two differences with the proceeding here. Because we do not. Those are. There is not a clear and convincing standard of proof for an IPR. And given it's the agency reexamining its own patent. It's a question. It's an open question. I think at least whether the clear and convincing, whether the presumption of validity should apply. And there's legislation pending that would address those questions. I don't think it turns here on that. There is a difference. And that is one reason to consider the district court's opinion to be not binding on the board. But I don't think that it turns on the difference here. Also, just to make a point on these facts. Even if you were to adopt the claim construction and the board didn't say this. But GH said this below. You still win. Because even if a location signal is output by the GPS device. And then a second signal is output. The data is still getting cut down. And that is at. When you say cut down. So you think that just limiting the data is the same as reordering it? And reordering. And reordering. Both. I don't think so. Reordering is the limitation that seems to be the one that maybe there could be some dispute about. Because selecting clearly must happen. And to go back to my table example. If the reference says that the legs are attached to the new pool table with all these new features. But it doesn't explicitly say if you use nails or screws. If somebody comes along and says, no, no. You need to use the screws. The first reference, because it's within the ordinary skill in the art to use the nails or screws. It teaches it. It teaches or suggests. It may not be explicit. But there's a long line of cases saying that it goes beyond. That teaching or suggestion goes beyond the explicit teachings of the references. This is like a design choice within the range of KSR. But even if it's not. There is the evidence that was presented. Especially from Mr. McAlexander, the Lunari's own expert. If that's only in the second IPR and you don't have that in the first IPR. How do we go outside the record of an individual IPR for purposes of saying that there's substantial evidence in the record of that IPR? Then we would be only relying on the references and the testimony on the level of skill in the art. That there's a high level of skill in the art. Both the experts agreed. So for the first IPR, it would be the teaching of the reference itself. And I think this is not a complicated question. It's cutting and pasting data. It's already done all the complicated things. Isn't it right though that the board. You're talking about your inherency maybe or that it necessarily is taught by the reference. But the board in its opinion. I'm looking at JA14. I think it's the right site. Says furthermore. We conclude that the record as a whole indicates that one of our years ago would have found it obvious. And then the bond court would have changed the order of the data fields and goes on. And explains. For example, changing the order of time and latitude and so on. So it seems to me as if at least there you've got the board relying on obviousness. Maybe as an alternative or additional ground. I think that might be a fair reading. The board's opinion is a little. I think the board's opinion is on the cost between teaching and obviousness. But I think it still falls in the teaching. Because A14 it says sufficiently that we conclude sufficiently that. I see what you're saying. I think your better answer on this though is at first they said it was necessarily taught. And then they said furthermore. That's exactly what's in there. We conclude that the record as a whole indicates that it would have been obvious. So there's, you know, belt and suspenders approach perhaps. I think that's probably a better way of reading it. And then the conclusion on A16 still says considering the ordinary scale and evidence of record, we find that Oncor would have taught or suggested to an ordinary artisan. And I guess that's what I'm, there is that. The question is which, what are they saying? Are they saying that it really does teach? I mean they actually don't say it expressly teaches it because it's hard to find it expressly teaching it. I don't think they said it expressly teaches it because I can't find where that is in the record. But I think it's on the order of such a small non-expressed teaching. Sometimes the most obvious things are the hardest to point to within a reference because why would you say in a one of skill in the art something that's so basic? You wouldn't say to put the nail or the screw because you would just say a fix. So it's much, it's within the teachings of, these references are written for people of skill in the art rather than putting every sub-detail of what someone might know. I mean rather than having the recipe saying okay find a spoon, the spoon should be of this size and it must be mixed, can be mixed forward or backward. When you start getting to that level of detail in a claim that's allegedly novel that it becomes hard to find art that says that, that amount of detail. And here this, if you look, if there must be one NMEA output message and another NMEA output message with different orders. But I mean usually when you have a gap, you know, you say it's hard to find a reference but it wouldn't be so hard necessarily to find someone of skill in the art to testify that in fact from that reference that logical conclusion would follow. And in this particular instance Gordon Howard never offered that testimony. I don't know why, if it's so obvious or so easy to do, but they didn't. Well by the, initially in their petition I think it would have been a better thing. It would have been a better thing if they initially in their petition instead of having their experts say look it must be doing it if they said, you know, that it had their experts say within the ordinary skill in the art. They did say that, the attorney argument in the petition did say that. The attorney argument. The attorney argument, but they did say it. It's an attorney argument but they said it. It would have been nicer in their initial petition. They said that. By the time of the depositions and the replies they did end up with Dr. Jenke saying that it's, let's see. Where is that? The replies. The replies, well actually they still were relying primarily on the well it must be doing it and look at that it's saving but there must be an initial order and then they're saving. They pointed in their reply. I don't think they needed to point in their reply because by their reply in the second IPR they had Dr. Alexander which is even better when your opponent is admitting it. But that's in the second IPR. That's in the second IPR. In the first IPR we have the reference and we have the level of skill in the art. Okay. Okay. Any more questions? We're good. More questions? Okay. Thank you Ms. Hunt. Mr. Abbott let's see we've run over. Let's make it eight minutes. I may not need it. If it pleases the court. I'd like to address three main points that Ms. Hunt raised with you and the first is I'm going to go out on a limb here. I would ask that you or your clerks run a search on suggest in the record. In particular Gordon Howard's petitioner's pleadings at the PTAB and I don't believe you'll find it. And the reason is clear because they said that Encore and Lewis explicitly recite or disclose the data selecting and data reordering element. And even though they may have said that it would be within the skill, they don't say modification would be within the skill. And so my client is behind the eight ball here. Well they're not saying, I mean the board's not arguing. I didn't understand your friend on the other side to say that those references had to be modified. I thought her point was that you can logically conclude that it is teaching it even if it doesn't say so in so many words. Well with respect to the point that you raised in your questions, there's good reason why Gordon Howard didn't raise that because that would render the Encore device inoperable. We're talking about what's going on in 1998. Selective availability, GPS turned off and on for military concerns. We're talking about the advent of commercial marketing of GPS products and we're talking about interoperability. We're talking about being able to communicate with other devices directly off the shelf. That's what the NMEA standards are directed to. And that's why the experts uniformly, both Gordon Howard's expert, our expert, as we understood it, the petitioner as well as arguments that we made, is that the NMEA is not subsequently reordered. What about your expert's admission in the second item? And I think, and Nuvasiv just came out and it reached my hot hands just this morning and I just stumbled on it. Nuvasiv, as I read it, was essentially that you can't take an expert's, the board can't take an expert's testimony or declaration out of context for purposes of claim construction. Which it didn't go as far to say, which ultimately rendered it obvious. I think that was an issue that the court didn't decide in that opinion. But it remanded back in consideration for that. But the point being is that Mr. McAlexander's testimony, I think, was taken out of context. And that is, yes, and we don't quibble or dispute that in the world of software development, software computer science, that one of skill and art couldn't select less than all rewards. There's a number of ways to do that. But not in the context of GPS receiver technology. And that is what we're talking about here. Not just some one-off, we're going to program some other consumer electronics device. We're talking about a GPS receiver that practices a standard for interoperability purposes. Not to mention, as I discussed earlier, the timing considerations. And Mr. McAlexander talked about the timing considerations at great length. I believe his deposition and maybe his declaration as well. And that is the data that's received, and we all have GPS. We know how fast that is. And delay on it creates additional propagation, delays that have to have additional calculations and slows things down and would essentially render it inoperable, which I think – it's either Black & Decker or Cutsworth talks about that. You don't want to modify something that renders – I mean you can't have a modification of the art to read on the claims if it renders it inoperable. I just – I'm still – I still don't think you've addressed the issue of the admission. Because I hear what you're saying. You can't take it out of context. And so I get that. But your expert was saying we don't need to say certain things in the patent in order to render it enabled or not indefinite because everybody would know how to do it or a person of skill in the art would know how to do it. How is that not an admission that couldn't be translated to what someone would have read in the prior art? In fairness, I can see how it could be read that way. But I truly believe that the way Mr. McAlexander was addressing this was in the context of computer science generally. And what we've seen – and again, when we look at the big picture of this thing, the big picture of the art, it's not something you want to do. It's not something that would be done. It's something that would have rendered the devices either inoperable or ineffective for their intended purposes. And so – have I answered your question, Your Honor? Now, why would it render it inoperable? Well, because one, if you started – if the GPS receiver itself started modifying NMEAs, it's to be compliant with a standard. And so you have to have a recipient on the other end of the GPS receiver that receives that process signal that can pick it up. And so you could go mix and match your various devices that operate on an NMEA standard that they could communicate with one another. So that's one aspect. And then the timing aspect is another, that the delays would render the GPS device effectively useless. Wasn't the board relying on the fact that that NMEA has different protocols, so that's still compliant? Even if there's two different protocols, they still would be compliant, right? That there's different message options that contain different data that is in a different order. Correct. And the NMEA has approximately seven different messages that have varying amounts of data that can be constructed. And so for whatever your intended purpose, you may select one over the other. And so your devices are going to be compliant maybe with GGA, GLL, I think RMC is another one. There's I think approximately seven of them. But that's constructed in the Encore MPU, which you'll find in Appendix 895, the block diagram. That's constructed in the MPU. And this brings me to the second issue that I'd like to address in rebuttal. And that is there is no order of the location data in the first instance until it's placed on a signal. The signals coming down from the satellites are simply pseudo-random signals, ones and zeros that are picked up by the antenna of the GPS receiver. Go through some filtering process where you get to the digital signal processor, which is described in Encore. And in the DSP is where it goes through a correlation process. And it takes these ones and zeros and puts slivers of information on different channels. Individually, that means nothing to determine your current position or a triangulated position of where you are. It's nothing. It's really just a bit of information that has to be transmitted with all of the other information to the MPU. After it's been converted to a digital signal. And then mathematical equations are run on it. A lot of math is run on it in a very quick amount of time to come up with your location. And then that location is spelled out in an amena in the MPU. And it's transmitted across the RS-232 to a separate controller, which I think, as I mentioned earlier, assists with our disclaimer argument. Okay. How about wrapping it up in a few sentences? Yes, Your Honor. And the last point I'd like to make, I'm very aware of this loggerheads between the judicial and the executive branch. We will have to figure that out. Right, right. But the point being is that there is nothing in the specification, there's no record evidence that would allow the board to deviate from Judge Clark's reasoned opinion with respect to location signal. So there's nothing in there that would allow them to do what they did. And there's nothing in there to suggest that what he found, even though we're talking pre-Nautilus, was not compliant with the BRI. And we believe that if you adopt Judge Clark's rationale and reasoning with respect to two location signals, that this court should reverse and render. I thank you for your time. Thank you. Thank you both. Well presented. Interesting case.